# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCHES OF CELLULAR DEVICE ASSIGNED CALL NUMBER 203-218-0566. | Case No. 23mj127 MEG  **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH WARRANTS

I, Alex Rivera, currently assigned as a Task Force Officer with the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned call number 203-218-0566 ("the TARGET TELEPHONE"), which is used by Zaquawn ARRINGTON and subscribed to LOCUS COMMUNICATIONS, 111 SYLVAN AVE, ENGLEWOOD CLIFFS, NJ 07632, that is in the custody and control of AT&T (the "Service Provider" or "Provider"), 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408. As a provider of wireless communications service, the Provider is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2. The information to be searched is described in the following paragraphs and in Attachment A-1. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the Provider to disclose to the government the information further described in Section I of Attachment B-1. Upon receipt of the information described in Section I of Attachment B-1, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.    Because I am seeking the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the TARGET TELEPHONE.

4.    I also make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B-2, to determine the location of the TARGET TELEPHONE, which is described in Attachment A-2.

5.    I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the Unites States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses. I am employed as a Police Officer with the New Haven Police Department and have been a Police Officer since January of 2016. I am currently assigned to the Investigative Services Division of the New Haven Police Department and am currently assigned to the Federal Bureau of Investigation Safe Streets Gang Task Force ("Task Force") as a Task Force Officer in the New Haven Field Office.

6.    While employed as a Task Force Officer with the FBI, I have conducted investigations of, and have been instructed in, investigative techniques concerning the unlawful distribution of illegal narcotics, possession with intent to distribute controlled substances, importation of illegal narcotics, use of communication facilities to conduct illegal narcotics transactions, maintaining

places for purposes of manufacturing, distributing or using controlled substances and conspiracies to commit these offenses.

7.   Based upon this experience, and through the experience of other agents and Task Force Officers with numerous years of experience, I have also become well versed in the methods used in illegal narcotics trafficking, the specific type of language used by illegal narcotics traffickers, and the unique patterns employed by narcotics organizations.  I have also conducted physical, electronic, and wire surveillance.  Additionally, I have arrested individuals for various drug violations and have spoken with a number of drug dealers, drug users, and confidential sources concerning the methods and practices of drug traffickers.  As a result of my law enforcement experiences and the experience of other agents and detectives, I have worked with to investigate drug traffickers, I have found that they rarely speak openly about their illegal narcotics transactions.  Instead, they use coded language to disguise their conversations about illegal narcotics transactions and also communicate via text messages.  I am also aware that cellular telephones provide illegal narcotics traffickers with mobile access and control over their illegal trade.  They often use cellular telephones to communicate with one another in furtherance of their illegal narcotic activities via both voice and text message communications.  I also know that illegal narcotics traffickers routinely use false information when registering their cellular telephones and use cellular telephone numbers and cellular telephones for short periods of time.  I have also conducted investigations involving the identification of co-conspirators using telephone records and bills, financial records, drug ledgers, photographs, and other documents.

8.   The facts in this affidavit come from my personal observations, my training and experience, my conversations with other Agents and Task Force Officers who have specialized training in cellular technology, cell site analysis, and the use of Cell Site Simulators, and information obtained

from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.   One purpose of applying for this warrant is to determine with precision the TARGET TELEPHONE location. There is reason to believe the TARGET TELEPHONE are currently located somewhere within the District of Connecticut because Zaquawn ARRINGTON uses the TARGET TELEPHONE and is known to be a resident of Connecticut. Moreover, as described below, ARRINGTOON is on federal supervised release in the District of Connecticut. Pursuant to Rule 41(b)(2), law enforcement may locate the TARGET TELEPHONE outside the District of Connecticut provided the TARGET TELEPHONE is within the District of Connecticut when the warrant is issued.

10. Based on the facts set forth in this affidavit, there is probable cause to believe that Zaquawn ARRINGTON has committed violations of 21 U.S.C. §§ 841(a)(1), (1)(1)(C) (Possession with the Intent to Distribute, and Distribution of Controlled Substances), and 21 § U.S.C. 846 (Conspiracy to do the same) (the "Subject Offenses").  ARRINGTON was charged under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) on February 16, 2023 and is the subject of an arrest warrant issued in the District of Connecticut. There is also probable cause to believe that the location of the TARGET TELEPHONE will constitute evidence of those criminal violations, including identifying locations where ARRINGTON engages in narcotics trafficking.

11. Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41.  See 18 U.S.C. §§

3121-3127. This warrant therefore includes all the information required to be included in a pen register order. *See* 18 U.S.C. § 3123(b)(1).

12. Based on the facts set forth in this affidavit, there is probable cause to believe that ARRINGTON uses the TARGET TELEPHONE to commit violations of the Subject Offenses. The TARGET TELEPHONE location will assist law enforcement in identifying the location for ARRINGTON, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

**PROBABLE CAUSE**

13. I am one of the case agents in an investigation being conducted by the New Haven Safe Streets Task Force into drug dealing and other offense committed by a drug trafficking organization which operated in and around the "Hill," area of New Haven (the "DTO"). This investigation has revealed that ARRINGTON is involved in narcotics trafficking with the DTO.

14. By way of background, in January 2022, ARRINGTON pled guilty to 21 U.S.C §§ 841(a)(1) and 841(b)(1)(C) (possession with intent to distribute cocaine base) in case number 3:21-cr-127 (MPS). As a result of that conviction, the Honorable Michael P. Shea, USDJ, imposed a sentence of time served and a term of supervised release of 3 years. ARRINGTON remains on supervised release in case number 3:21-cr-127 (MPS).[1]

---

[1] On January 9, 2023, the Hon. Michael P. Shea, the presiding judge in ARRINGTON's case, held a compliance hearing to discuss the defendant's non-compliance the terms of his supervised release. The misconduct described within this affidavit was not mentioned at the hearing so as not to threaten the ongoing investigation, but FBI personnel informed ARRINGTON's supervising probation officer in advance of the hearing that ARRINGTON was suspected of dealing drugs again, was under investigation, and would likely be arrested again.

15. Between October 2022 and December 2022, members of the FBI New Haven Safe Streets/Gang Task Force conducted controlled purchases of suspected heroin and cocaine base from ARRINGTON with the assistance of an FBI Cooperating Witness ("CW").[2]

**FIRST CONTROLLED PURCHASE DURING THE WEEK OF OCTOBER 11, 2022**

16. During the week of October 11, 2022, the CW conducted a controlled purchase of cocaine base and fentanyl compound from Arrington, a.k.a. "Dreads," who used the TARGET TELEPHONE to facilitate the transaction.

17. In the presence of investigators, the CW placed a call on speakerphone to the TARGET TELEPHONE and a male whose voice the CW recognized as "Dreads" answered the phone.[3] During the conversation, the CW requested "two paper, two bundles." The CW and "Dreads" arranged a meet location for the transaction in New Haven, Connecticut. Investigators confirmed that the CW called the TARGET TELEPHONE by viewing the CW's call history.

18. Soon after, while the CW was still in the presence of investigators, "Dreads" called the CW from the TARGET TELEPHONE to arrange a new meet location in New Haven to complete the transaction. Investigators searched the CW for money and contraband with negative results.

---

[2] The CW has been provided monetary compensation in exchange for the information and services he/she provides to Law Enforcement. The CW began cooperating with the FBI in the present case in October of 2022. The CW has multiple prior convictions, including prior felony convictions for sale of narcotics, possession of narcotics, and escape. CW provided information to the FBI from July of 2018 through November of 2018 and again from approximately March of 2021 through present date. Agents have found the information that the CW has provided to be accurate and it has been corroborated in part by independent information obtained by investigators in the current investigation into ARRINGTON and his associates.

[3] On September 27, 2022, investigators showed the CW a known photograph of ARRINGTON and the CW identified the individual in the picture as the person he/she knows as "Dread."

Investigators then gave the CW $90 in government funds to complete the transaction. Investigators also equipped the CW with a covert audio/video recording device.

19. The CW then got out of the investigators' vehicle and walked out of their sight to meet "Dreads" at the sale location. Approximately six minutes later, the CW met with investigators at a predetermined post-buy meet location.

20. There, the CW gave investigators the audio/video recording device, twelve blue wax folds, each containing a brown powder-like substance (suspected fentanyl), and three clear plastic Ziploc style bag (two red and one green), containing an off-white, rock/chunk-like substance (suspected crack cocaine). Investigators searched the CW for money and contraband with negative results. The CW told investigators, in substance, that the CW met with "Dreads," who was driving a brown Nissan Altima. The CW stated that a second individual he/she knows as "Frank" (investigators later identified this individual to be someone with the initials M.J.) was in the passenger seat of the Nissan Altima. The CW gave the $90 that investigators had provided to him/her for the purchase to "Frank" and "Dreads." In exchange, "Dreads" gave the CW narcotics, which had been stashed in the driver-side of the Nissan Altima.

21. Investigators transported the suspected cocaine base and fentanyl compound to the FBI New Haven Office There, investigators photographed, weighted, and tested the evidence. The suspected fentanyl field-tested positive for fentanyl compound and the suspected cocaine base field tested positive for cocaine base. Investigators sent the suspected fentanyl compound and cocaine base to the DEA laboratory for testing but have not yet received the results. Investigators watched the recording captured by the device that the CW wore during the meeting with "Dreads," and it is consistent with the CW's description of the sale. Moreover, the recording revealed that ARRINGTON sold the CW the suspected fentanyl compound and cocaine base.



[Screen capture of the recording device utilized during the First Controlled Purchase.]

## SECOND CONTROLLED PURCHASE DURING THE WEEK OF DECEMBER 13, 2022

22. During the week of December 13, 2022, the CW arranged for a controlled purchase of suspected heroin from an individual who is known to investigators by contacting ARRINGTON, a.k.a. "Dreads," on the TARGET TELEPHONE.

23. In the presence of investigators, the CW called the TARGET TELEPHONE on speakerphone and a male whose voice the CHS recognized as "Dreads" answered. During the conversation, the CW requested "two paper, whole ones." The CW and "Dreads" arranged a meet location for the transaction in New Haven, Connecticut. Investigators observed the CW's cell phone call history and confirmed that the call was placed to the TARGET TELEPHONE. Investigators searched the CW for money and contraband resulting in $10 found on the CW, which investigators seized and held until the controlled purchase was completed. Investigators gave the CW $100 in government funds to complete the transaction. Additionally, investigators equipped the CW with an audio/video recording device.

24. The CW got out of the investigators' vehicle in the area Chapel Street, New Haven, Connecticut. At this point, the CW received a call from an individual who the CW identified as "Dreads." During this call, "Dreads" told the CW to look for a black Jeep. Investigators maintained surveillance as a black Jeep parked near the CW. The CW got into the front passenger seat of the black Jeep. Approximately one minute later, investigators saw the CW get out of the black Jeep and the Jeep drove away. Investigators then picked up the CW.

25. Investigators debriefed the CW and retrieved the audio/video recording device. The CW turned over ten purple wax paper folds, each containing a brown powder-like substance (suspected heroin), and $50. Investigators searched the CW for additional money and contraband with negative results. The CW told investigators, in substance, that after "Dreads" told him to look for a black Jeep, a black Jeep parked near the CW. The male driver of the black Jeep, who was not "Dreads," nodded at the CW and the CW got inside. CW then gave $50 to the driver of the black Jeep. In exchange, the driver of the black Jeep gave the suspected heroin to the CW. The CW asked the driver of the black Jeep for his phone number, and the driver of the black Jeep told the CW to continue to call "his brother." The CW understood this to mean that he/she should continue to contact "Dreads."

26. Investigators transported the suspected heroin to the FBI New Haven Office There, investigators photographed, weighed, and field- tested the evidence. A sample of the powdery substance that the driver of the black Jeep sold to the CW tested positive for the presumptive presence of heroin. Investigators sent the suspected heroin to the DEA laboratory for additional testing but have not received results.

27. Investigators watched the recording captured by the device that the CW wore during the meeting. Although the video does not capture the face of the driver of the black Jeep, it is nonetheless consistent with the CW's description of the sale.

**THIRD CONTROLLED PURCHASE DURING THE WEEK OF DECEMBER 20, 2022**

28. During the week of December 20, 2022, the CW arranged for a controlled purchase of suspected fentanyl from M.J. (the same individual who was present with ARRINGTON during the October 11, 2022 sale described above) and cocaine base an individual the CW knows as "Red" by contacting Arrington, a.k.a. "Dreads" on the TARGET TELEPHONE.

29. In the presence of investigators, the CW exchanged a series of text messages with the TARGET TELEPHONE in which he/she arranged to meet. While still in the presence of investigators, the CW then placed a call, on speakerphone, to the TARGET TELEPHONE and a male whose voice the CW recognized as "Dreads" answered. The CW and "Dreads" arranged a meet location for the transaction in New Haven, Connecticut. Investigators observed the CW's cell phone call history and confirmed that the call was placed to the TARGET TELEPHONE.

30. Investigators searched the CW for money and contraband with negative results. Investigators gave the CW $140 in government funds to complete the transaction. Additionally, investigators equipped the CW with an audio/video recording device and a live audio/video recording device that transmits location data. The CW got out of the investigators' vehicle in the area Spring Street and Howard Avenue, New Haven, Connecticut and investigators maintained surveillance. Soon after, the CW received a call (which investigators later confirmed was from the TARGET TELEPHONE) and was redirected to a new meeting location for the transaction.

31. While under observation of the surveillance team the CW was seen walking towards the transaction location of 113 Hurlburt Street, New Haven, Connecticut. At 3:40 p.m., investigators

observed via the recording/transmitter device the CW to be in the area of 113 Hurlburt Street. Soon after, a surveillance unit observed a white Chevrolet Transverse drive from the area of 113 Hurlburt Street and travel to 250 Spring Street, New Haven, Connecticut. The surveillance unit observed a black male with a beard and black winter hat exit the vehicle and walk into the front door of 250 Spring Street, New Haven, Connecticut. At approximately 3:54 p.m., investigators saw the recording/transmitter device moving towards the predetermined post-buy meeting location.

32. At 3:56, investigators met with the CW at the predetermined post-buy meet location. There, the CW gave investigators the audio/video recording/transmitting device, a thin glass tube with a copper wire-like material, twenty light blue wax paper folds containing a white powder-like substance, suspected to be fentanyl compound, and five clear plastic baggies containing white rock-like substance, suspected cocaine base. Investigators searched the CW for money and contraband with negative results.

33. The CW told investigators, in substance, that he/she made controlled purchases from two individuals. The CW said he/she gave $87 to M.J. (who was present at the October 11, 2022 controlled purchase described above) and that M.J. gave the CW the two bundles (each containing 10 wax folds) of suspected fentanyl compound. The CW further stated that he/she gave $50 to "Red" and, in exchange, "Red" gave the CW five baggies of suspected cocaine base. Investigators transported the suspected fentanyl compound and cocaine base to the FBI New Haven Office. There, investigators photographed, weighed, and tested on the evidence. A sample of the suspected fentanyl was positive for the presence of fentanyl compound. A sample of the suspected cocaine base was positive for cocaine base.

## CELL-SITE DATA

34. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the TARGET TELEPHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

35. Based on my training and experience, I know that the Service Provider maintains timing advanced data which they refer to as "True Call/Timing Advanced." True Call/Timing Advanced data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

36. It is believed that issuance of these warrants will allow agents and officers to determine the location of ARRINGTON and will enable agents and officers to effect his arrest in a manner which best ensures the safety of law enforcement officers, the community and ARRINGTON himself. It appears that ARRINGTON carries his telephones on his person, and I believe that the TARGET TELEPHONE will show where ARRINGTON is located for the purposes of executing an arrest warrant and may also provide evidence of his ongoing criminal activity. Specifically, aside from

locating ARRINGTON himself, I expect to find evidence of criminal activity in his telephone and in the form of narcotics on his person or nearby based on the criminal conduct described above.

## E-911 PHASE II / GPS LOCATION DATA

37. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

38. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the TARGET TELEPHONE, including by initiating a signal to determine the location of the TARGET TELEPHONE on the Service Provider's network or with such other reference points as may be reasonably available.

## THE REQUESTED PEN REGISTER

39. I believe the installation and use of pen-register devices or processes and trap-and-trace devices or processes, as well as the requested electronic communications records and/or information concerning the TARGET TELEPHONE will provide information that is relevant and

material to the ongoing criminal investigation described above. Among other things, this information will assist in determining who is using the TARGET TELEPHONE to facilitate and arrange narcotics transactions.

40. Based on the foregoing, there are reasonable grounds to believe that the information likely to be obtained by the installation and use of a pen register device or process and trap and trace device or process on the TARGET TELEPHONE is relevant to the ongoing criminal investigation, and that specific and articulable facts are set forth in the affidavit showing that there are reasonable grounds to believe that the electronic communications records and/or information sought are relevant and material to the ongoing criminal investigation.

41. WHEREFORE, I request that the Court enter an Order authorizing agents to install a pen register and trap and trace device and for disclosure of telecommunications records with respect to the TARGET TELEPHONE, including PCMD data regarding the TARGET TELEPHONE.

## SUBSCRIBER INFORMATION

42. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because

the information can be used to identify the TARGET TELEPHONE user or users and may assist in the identification of co-conspirators and/or victims.

## MANNER OF EXECUTION

43. In my training and experience, I have learned that individuals typically carry their cellular phones on their person at all times so that they can communicate with others.

44. In my training and experience, and conversations with other Agents who have specialized training in cellular technology and cellular analysis, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications.  When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication.  These signals include a cellular device's unique identifiers.

45. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the TARGET TELEPHONE or receiving signals from nearby cellular devices, including the TARGET TELEPHONE.  Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others.  The device may send a signal to the TARGET TELEPHONE and thereby prompt it to send signals that include the unique identifier of the device.  Law enforcement may monitor the signals broadcast by the TARGET TELEPHONE and use that information to determine the TARGET TELEPHONE's location, even if it is located inside a house, apartment, or other building.

46. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity.  Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices.  In order to

connect with the TARGET TELEPHONE, the device may briefly exchange signals with all phones or other cellular devices in its vicinity.  These signals may include cell phone identifiers.  The device will not complete a connection with cellular devices determined not to be the TARGET TELEPHONE, and law enforcement will limit collection of information from devices other than the TARGET TELEPHONE.  To the extent that any information from a cellular device other than the TARGET TELEPHONE is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the TARGET TELEPHONE from all other cellular devices.

## **AUTHORIZATION REQUEST**

47. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.  The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

48. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

49. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B-1 that is within its possession, custody, or control.

50. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B-1 unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phones on the Service Provider's network or with such other reference points as may

be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

51. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days "after the collection authorized by the warrant has been completed." There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the TARGET TELEPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

52. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET TELEPHONE outside of daytime hours.

**SEALING**

65. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.   These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

ALEX RIVERA
TASK FORCE OFFICER, FBI

Subscribed and sworn before me in New Haven, Connecticut on February *16*, 2023

HONORABLE MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### Property to Be Searched

1. Records and information associated with the cellular device assigned telephone number (203) 218-0566 (the "TARGET TELEPHONE"), which is subscribed to LOCUS COMMUNICATIONS, 111 SYLVAN AVE, ENGLEWOOD CLIFFS, NJ 07632, that is in the custody and control of AT&T, 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408 (the "Service Provider").

2. The TARGET TELEPHONE

**ATTACHMENT B-1**

**Particular Things to be Seized**

I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of AT&T (including any information that has been deleted but is still available to AT&T or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f)), AT&T are each required to disclose to the government the following information pertaining to the TARGET TELEPHONE listed in Attachment A-1:

A. The following subscriber and historical information about the customers or subscribers associated with the TARGET TELEPHONE from October 1, 2022, to the present, including:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers

("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the content of communications) relating to wire and electronic communications sent or received by the TARGET TELEPHONE from October 1, 2022, to present including:

    a. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    b. Information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as Internet Protocol Data Report (IPDR) with cell site data, and True Call Timing Advance Data for all voice, text, and data communications

B. Information associated with each communication to and from the TARGET TELEPHONE for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the TARGET TELEPHONE will connect at the beginning and end of each communication as well as per-call measurement data.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, under the same docket number, for such information associated with the TARGET TELEPHONE.

C. Information about the location of the TARGET TELEPHONE or a period of 30 days, from the date of this warrant, during all times of day and night.

"Information about the location of the TARGET TELEPHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information to include all data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the TARGET TELEPHONE will connect at the beginning and end of each communication as well as all available E-911 Phase II data, True Call Timing Advance data, GPS data, latitude-longitude data, mobile locator information, Network Event Location Operating System information (NELOS), historical precision GPS location information, historical handset location data, handset triangulation data, engineering data set, PCMD (per call measurement data, and location information derived therefrom), Real-Time Tool (RTT) data, timing advance information, WebMap, and other precise location information;

    i.   To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T, AT&T is required to disclose the Location Information to the government. In addition, AT&T must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T's services, including by initiating a signal to determine the location of the TARGET TELEPHONE on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

    ii.   This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government:

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics) and 846 (conspiracy to distribute and possess with intent to distribute narcotics) involving ARRINGTON during the thirty-day period from the date of the warrant.

## ATTACHMENT A-2

This warrant authorized the use of the electronic investigative technique described in Attachment B-2 to identify the location of the cellular device assigned call number 203-218-0566, whose wireless service provider is AT&T.

## ATTACHMENT B-2

This warrant authorizes the Officers and Agents to whom it is directed to determine the location of the cellular devices identified in Attachment A-2 by collecting and examining:

1.  Radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2.  Radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by Officers and Agents;

For a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. See 18 U.S.C. § 3103a(b)(2).